# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37526

| | | |
|---|---|---|
| FRANZ SUHADOLNIK and BETTY SUHADOLNIK, individually and as husband and wife, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Boise, May 2011 Term |
| | ) | 2011 Opinion No. 58 |
| SCOTT H. PRESSMAN, M.D., SCOTT H. PRESSMAN, M.D., a limited liability company, THE EYE ASSOCIATES, P.A., an Idaho corporation, and BUSINESS ENTITIES I through X, and JOHN DOE AND JANE DOE, husband and wife, I through X, | ) ) ) ) ) ) ) ) ) | Filed: May 25, 2011

Stephen W. Kenyon, Clerk |
| Defendants-Respondents. | ) ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Honorable Patrick H. Owen, District Judge.

The judgment of the district court is <u>affirmed</u>.

Pedersen and Whitehead, Twin Falls, for appellants. Jarom A. Whitehead argued.

Carey Perkins LLP, Boise, for respondents. Terrence S. Jones argued.

_____

J. JONES, Justice.

This is a medical malpractice case arising from a cataract operation performed by Dr. Scott Pressman on plaintiff-appellant Franz Suhadolnik. The Suhadolniks appeal the district court's summary judgment order in favor of Respondents based on its determination that the Appellants' expert, Dr. Hofbauer, failed to adequately inform himself on the local standard of care. We affirm.

- 1 -

# I.

## Factual and Procedural History

Appellant Franz Suhadolnik argues that his cataract surgeon, Dr. Pressman, failed to adequately inquire about his prior use of the prescription drug Flomax,[1] which resulted in increased risks during surgery and a lack of informed consent. Suhadolnik further argues that, as early as 2005, there were indications in medical journals and an advisory from the Food and Drug Administration (FDA)[2] that prior use of Flomax puts patients at risk of greater complications during cataract surgery.[3]

Suhadolnik met with Dr. Pressman at The Eye Associates in Boise, in October of 2005, to discuss the possibility of cataract surgery. During this visit, Dr. Pressman performed an eye exam, and informed Suhadolnik that he would need cataract surgery at some point in the future. Suhadolnik completed a medical history form during the visit, which did not list Flomax as a current medication. Suhadolnik testified that this description was accurate because he started taking the medication in December of 2005 (two months after the October visit), pursuant to a prescription from his personal care physician, Dr. Paris. After experiencing several ill side effects, Suhadolnik quit taking Flomax in approximately January of 2006, but resumed use of the prescription in a lesser dosage after the cataract surgery with Dr. Pressman.

Suhadolnik elected to forgo cataract surgery until May of 2006, when he contacted The Eye Associates and was informed he needed a clearance for surgery from his physician. Dr. Paris performed this exam on May 25, 2006, and cleared him for surgery. The first page of the document created during this exam lists "current medications" taken by Suhadolnik as: Simvastatin, Cyclocort, Lisinopril, and "FLOMAX 0.4MG, 1 TAB QD-days, 30, Ref: 11." Flomax is also separately identified as a prescription on the second page. Dr. Pressman testified that this document was in his file, and presumably available to him prior to the surgery, but that he had no recollection of reviewing it prior to Suhadolnik's surgery.

On May 30, 2006, Suhadolnik went to The Eye Associates for a pre-operation visit. During this visit, Suhadolnik completed another medical history form, and signed consent forms. The medical history form asked the patient to "List all meds and dosages you use," and only

---

[1] Flomax is a medication that relaxes the muscles around the bladder to aid males with urination.

[2] Appellants failed to include this FDA advisory in the record of this appeal. Therefore, we decline to consider its contents.

[3] Dr. Pressman acknowledged some evidence of increased risks during cataract surgery as a result of prior use of Flomax, but stated that at the time of Suhadolnik's surgery in 2006, this data was still inconclusive.

Zocor and Lisinopril were identified in response. The additional paperwork completed during this visit included an informed consent form for the cataract surgery, which warned that: 1) the results of the surgery could not be guaranteed; 2) complications of the surgery to remove the cataract could make vision in the eye worse; and 3) lens implantation may include loss of corneal clarity, infection, an inability to dilate the pupil, and dislocation of the lens and retina. Yet another form identified the risks of anesthesia.

Dr. Pressman performed the cataract surgery on May 31, 2006. During the surgery, Suhadolnik's lens capsule came out of position allowing vitreous fluid to come into the anterior chamber of the eye. Pressman removed the fluid and placed an intraocular lens in the anterior portion of the eye; however, the preferable position for the lens is in the posterior position of the eye. After the surgery, Dr. Pressman asked Suhadolnik about prior use of Flomax, or a similar medication, that could cause a floppy iris such as was experienced during Suhadolnik's surgery. According to Dr. Pressman, this was the first time he learned of Suhadolnik's prior use of Flomax. Suhadolnik underwent additional surgery in 2007, but remains "legally blind in the affected eye."

Franz and Betty Suhadolnik filed this action in May of 2008, alleging that the defendants provided negligent care in the performance of Suhadolnik's cataract surgery. They also allege that the defendants failed to obtain Suhadolnik's informed consent as required by I.C. §§ 39-4501 through 39-4507. The defendants moved for summary judgment arguing that: 1) Dr. Pressman's affidavit was sufficient to shift the burden to the plaintiff to demonstrate that a material fact existed regarding a breach of the local standard of care; and 2) Dr. Pressman obtained the requisite consent from Suhadolnik prior to surgery because the risks of Flomax were inconclusive at the time of the surgery. In response, the Suhadolniks submitted the affidavit of Dr. Hofbauer in support of their argument that Dr. Pressman failed to meet the local standard of care and failed to obtain Suhadolnik's informed consent. However, the district court determined that Dr. Hofbauer's affidavit was inadmissible because he failed to demonstrate actual knowledge of the local standard of care and, therefore, granted summary judgment to the defendants on both counts. The Suhadolniks appealed to this Court.

## II.

### Issues on Appeal

I.  Whether the district court abused its discretion in excluding Dr. Hofbauer's affidavit on the ground that he did not demonstrate actual knowledge of the local standard of care?

II. Whether the Suhadolniks waived any arguments concerning their informed consent claims because they failed to separately address them in briefing?

III. Whether the Respondents are entitled to attorney fees on appeal?

## III.

### Analysis

### A. Standard of Review

Before determining whether there is sufficient evidence to raise a genuine issue of material fact to preclude summary judgment, this Court must first address the admissibility of expert testimony. *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 163, 45 P.3d 816, 819 (2002).

> The admissibility of the expert testimony is an issue that is separate and distinct from whether that testimony is sufficient to raise genuine issues of material fact sufficient to preclude summary judgment. . . . The liberal construction and reasonable inferences standard does not apply, however, when deciding whether or not testimony offered in connection with a motion for summary judgment is admissible.

*Id.* (internal citations omitted).

> When analyzing whether testimony offered in connection with a motion for summary judgment is admissible, this Court applies an abuse of discretion standard. An abuse of discretion review requires a three-part inquiry: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason. A district court's evidentiary rulings will not be disturbed by this Court unless there has been a clear abuse of discretion.

*McDaniel v. Inland Northwest Renal Care Group-Idaho, LLC*, 144 Idaho 219, 221-22, 159 P.3d 856, 858-59 (2007) (internal citations omitted).

**B. The district court did not abuse its discretion in holding that Dr. Hofbauer failed to demonstrate actual knowledge of the local standard of care.**

A precondition to the admission of testimony by a medical expert in a malpractice case is that the expert familiarize himself with the local standard of practice or care for the medical practice field at issue in the case. I.C. § 6-1013. The Suhadolniks contend that their medical expert, Dr. Hofbauer, adequately familiarized himself with the standard of care for ophthalmologists practicing in Boise by reviewing the deposition of Dr. Pressman. They point out that Dr. Pressman testified in his deposition that the standard of care requires the taking of an adequate patient history, keeping current with medical literature and FDA advisories and advising patients of the risks and complications of the surgical procedure at issue so that they may make an informed decision as to whether to proceed. They contend that Dr. Hofbauer based his testimony on these standards and that the district court erred in concluding otherwise. Furthermore, they point to inconsistencies between Dr. Pressman's deposition testimony and statements in his affidavit, contending that the district court erred in failing to take the inconsistencies into account in determining the inferences to be drawn from his testimony.

Respondents argue that Dr. Hofbauer failed to demonstrate how he familiarized himself with the local standard of care, pointing out that Dr. Pressman's deposition did not provide sufficient information regarding any relevant standard of care. Respondents also argue that there is no evidence that a local standard has been replaced by state or federal regulatory standards such that Dr. Hofbauer's knowledge of the national standards would be sufficient to define the local standard of care. Finally, Respondents argue that resolution of the question of the admissibility of expert testimony is a precursor to applying the liberal construction rules pertaining to a summary judgment motion, and that the district court did not improperly weigh conflicting evidence.

The district court determined that the defendants met their initial summary judgment burden by providing Dr. Pressman's affidavit, wherein he testified that he was familiar with the local standard of care for ophthalmology and cataract surgery in May of 2006 and that he did not breach that standard.[4] However, the court determined that the Suhadolniks' affidavit, submitted

---

[4] While the Suhdolniks also argue that Dr. Pressman's affidavit was too conclusory to meet Respondents' initial summary judgment burden, this evidentiary issue was not separately raised as an issue on appeal. Furthermore, this Court has held that a moving party must support their summary judgment motion with evidence, but it is the adverse party that must come forward with specific facts to support their claim. *See Foster v. Traul*, 141 Idaho 890, 893, 120

by Dr. Hofbauer, was inadmissible because Dr. Pressman's deposition did not contain information regarding the local standard of care "concerning precautions due to past use of the medication Flomax." The court specifically noted that Dr. Pressman testified in his deposition that he was not aware of a standard of practice regarding Flomax and was not aware of a standard requiring disclosure of increased risks for prior use of Flomax. Therefore, Dr. Hofbauer's reliance on Dr. Pressman's deposition was insufficient to familiarize himself with the local standard of care and his affidavit was inadmissible. Because no other evidence had been submitted, the court granted the Respondents' motion for summary judgment on the medical malpractice claim. For the same reasons, the court also granted summary judgment to the Respondents on the informed consent claim.[5]

In order to avoid summary judgment in a medical malpractice case, a plaintiff must provide expert testimony that the defendant doctor, or other health care provider, "negligently failed to meet the applicable standard of health care practice." *Dulaney*, 137 Idaho at 164, 45 P.3d at 820. In order for expert testimony to be admissible in a medical malpractice claim, the party must demonstrate:

> (a) that such opinion is actually held by the expert witness; (b) that the expert witness can testify to the opinion with a reasonable degree of medical certainty; (c) that the expert witness possesses professional knowledge and expertise; and (d) *that the expert witness has actual knowledge of the applicable community standard of care to which his expert opinion testimony is addressed.*

*Id.* (citing I.C. § 6-1013) (emphasis added). Additionally, I.C. § 6-1012 defines the community standard of care as:

> (a) the standard of care for the class of health care provider to which the defendant belonged and was functioning, taking into account the defendant's training, experience, and fields of medical specialization, if any; (b) as such standard existed at the time of the defendant's alleged negligence; and (c) as such standard existed at the place of the defendant's alleged negligence.

*Dulaney*, 137 Idaho at 164, 45 P.3d at 820 (citing I.C. § 6-1012) (internal citations omitted).

---

P.3d 278, 281 (2005). Therefore, Dr. Pressman's affidavit, which demonstrated knowledge of a local standard of care, provided a description of that standard, and alleged compliance with that standard, was sufficient to shift the burden to the plaintiffs to establish the foundation for Dr. Hofbauer's testimony. While there do appear to be inconsistencies between Dr. Pressman's deposition and affidavit, the Suhdolniks have failed to show how those inconsistencies reflect upon Dr. Hofbauer's knowledge of the local standard of care.

[5] We express no opinion on this holding of the district court, as the informed consent issue has not been properly raised on appeal. *See* Part III.C. below.

In addition to these foundational requirements, I.R.C.P. 56(e) requires that affidavits submitted on a motion for summary judgment must "set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." I.R.C.P. 56(e). The affiant must have personal knowledge of the facts contained within the affidavit and statements within it cannot be conclusory or speculative. *Dulaney*, 137 Idaho at 164, 45 P.3d at 820. Therefore, in a medical malpractice action, an expert must show that he or she is familiar with the local standard of care for the relevant timeframe and specialty, and "must also state how he or she became familiar with that standard of care." *Id.*

An out-of-area expert can meet the foundational requirement of personal knowledge by inquiring of a local specialist regarding the standard of care. *Id.* (citing *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 51, 995 P.2d 816, 821 (2000)). Additionally, when consulting with a local specialist, that specialist need not have practiced in the same field as the defendant, so long as the consulting specialist is sufficiently familiar with the defendant's specialty. *See Newberry v. Martens*, 142 Idaho 284, 292, 127 P.3d 187, 195 (2005). The plaintiff's expert can also make inquiries to another out-of-area specialist, so long as that specialist has had sufficient contacts with the area in question to demonstrate personal knowledge of the local standard. *See Shane v. Blair*, 139 Idaho 126, 130, 75 P.3d 180, 184 (2003).

Furthermore, where an expert demonstrates that a local standard of care has been replaced by a statewide or national standard of care, and further demonstrates that he or she is familiar with the statewide[6] or national standard,[7] the foundational requirements of I.C. § 6-1013

---

[6] For example, in *Grover v. Smith*, the plaintiff's expert demonstrated that the local standard of care for dentists was replaced by a statewide standard because the state licensing board required a patient history and because the Legislature codified these standards in the State Dental Practice Act, I.C. §§ 54-901 to 54-924. 137 Idaho 247, 253, 46 P.3d 1105, 1111 (2002). Further, the plaintiff's expert demonstrated knowledge of these statewide standards because he was a professor of dentistry at Creighton University in Nebraska, had administered and observed the Idaho state licensing exam, and had spoken to local dentists about the applicable standard. *Id.* This Court specifically noted that because the expert observed the licensing exams and stated that failure to take a patient's history would result in a failure of the exam, the expert had actual knowledge that the local standard had been replaced by a statewide standard. *Id.*

[7] An expert can meet the foundational requirements of I.C. § 6-1013 by demonstrating that a federal regulatory scheme has replaced the local standard of care and that the expert is familiar with this scheme. *Hayward v. Jack's Pharmacy Inc.*, 141 Idaho 622, 628, 115 P.3d 713, 719 (2005). In *Hayward*, the plaintiff's out-of-area expert reviewed the depositions of the defendant-pharmacists, reviewed the plaintiff's medical records, and spoke to a local pharmacist regarding the standard of care. *Id.* Not only did the depositions show that the local standard was the "start-low and go-slow" method for administering medication, but the local pharmacist confirmed this method and further stated that such standard was governed by state and federal regulations. *Id.* at 629, 115 P.3d at 720. Because the expert was familiar with these federal standards and had demonstrated that they replaced the local standard, this Court deemed the expert's affidavit testimony admissible. *Id.*

have been met. Specifically, an out-of-area expert can demonstrate familiarity with a local standard by speaking to a local specialist and by reviewing deposition testimony that establishes that the local standard is governed by a national standard. *Kozlowski v. Rush*, 121 Idaho 825, 828-29, 828 P.2d 854, 857-58 (1992). In *Kozlowski*, the plaintiff's expert reviewed the defendant's deposition testimony, wherein the defendant stated that the local standard was equivalent to the national standard and governed by a particular handbook. 121 Idaho at 829, 828 P.2d at 858. Because the expert was familiar with the handbook mentioned as embodying the national standard, and was board-certified in the specialty area, the Court held the expert demonstrated sufficient knowledge of the local standard of care. *Id. See also Perry*, 134 Idaho at 51-52, 995 P.2d at 821-22 (finding no abuse of discretion in the admission of expert testimony relying on the depositions of three hospital nurses and the review of a particular text, when the depositions identified that the local standard was equivalent to the national standard and governed by the text reviewed by the expert). Therefore, knowledge of a local standard can be established by reviewing deposition testimony and by speaking to local experts confirming that the standard has been replaced by a national standard.

Although *Kozlowski* and *Perry* are cited in subsequent decisions by this Court as providing a standard for the admissibility of expert testimony based on review of deposition testimony alone, this is an inappropriate characterization of the cases. *See, e.g., Grover*, 137 Idaho at 251, 46 P.3d at 1109 ("An out-of-state expert can become familiar with the local standard of care . . . by 'review of a deposition stating that the local standard does not vary from the national standard, coupled with the expert's personal knowledge of the national standard." (citing *Perry*, 134 Idaho at 51-52, 995 P.2d at 821-22)). In *Kozlowski*, the out-of-area expert reviewed not only deposition testimony, but also contacted a local practitioner to become familiar with the local standard of care. "In an effort to determine the local area standard of care, [plaintiff's expert] read the deposition of [defendant ob-gyn] Rush, the depositions of several nurses, spoke to a board certified ob-gyn who was practicing in Pocatello at the same time Stephanie was born, and read the deposition of Dr. V. Gene Rufi who is another board-certified ob-gyn practicing in Pocatello." 121 Idaho at 829, 828 P.2d at 858. Additionally, in *Perry*, the plaintiff's expert "reviewed the depositions of three Hospital nurses; reviewed a standard nursing text . . . ; talked with the executive director of the Idaho Board of Nursing; and spoke with nursing faculty members at two Idaho nursing schools to determine whether the Twin Falls

standard for administering intramuscular injections differed in any way from the national or state-wide standard." 134 Idaho at 51, 995 P.2d at 821. Therefore, the experts in *Kozlowski* and *Perry* clearly reviewed more than the defendant's deposition testimony in order to become familiar with the local standard of care.

While this Court has never affirmed the admissibility of expert testimony based solely on an expert's review of deposition testimony, we have stated that this may be sufficient. "[I]t *may* be possible for an expert to become familiar with the local standard of care by reviewing the defendant doctor's deposition . . . ." *Rhodehouse v. Stutts*, 125 Idaho 208, 212, 868 P.2d 1224, 1228 (1994) (emphasis added). *See also Newberry*, 142 Idaho at 292, 127 P.3d at 195 ("Inquiring with a local specialist is 'one method' an expert witness may obtain such knowledge, but it is not the only method.") (internal citation omitted). In *Rhodehouse*, the plaintiff's expert based his knowledge of the local standard of care on the defendant's deposition, 35 mm films, and hospital records. *Id.* at 212, 868 P.2d at 1228. Although the Court acknowledged that such a review *might* provide an adequate foundation for an expert's knowledge of the local standard of care, it found the deposition in that case to be insufficient because the deposition "never stated that the local standard of care was the same as the national standard, nor in fact did [the defendant-doctor] make any direct reference to the local standard of care."[8] *Id.* Therefore, while it may be acceptable for an expert to demonstrate knowledge of a local standard of care by reviewing deposition testimony, that testimony must clearly articulate the local standard for the particular time, place and specialty at issue in order to meet the foundational requirements of I.C. § 6-1013.

In this case, the Suhadolniks' expert, Dr. Hofbauer, stated that the local standard of care for cataract surgery in Boise, Idaho, in May of 2006, required an ophthalmologist to: (1) be current on medical literature and FDA advisories; (2) take an adequate medical history; and (3) advise patients of risks and complications thereby allowing them to make an informed decision. Dr. Hofbauer also stated that "[t]hese standards of care are very basic standards of ophthalmologists. In my opinion the standards of care relevant to Dr. Pressman's treatment of

---

[8] The opinion in *Rhodehouse* goes on to state "that an expert cannot become familiar with the local standard of care merely by reviewing hospital records and the actions of a local physician." 125 Idaho at 213, 868 P.2d at 1229. This does not mean, however, as both the district court and the Respondents contend, that review of these documents cannot add to the expert's knowledge of the local standard in order to meet the foundation requirements of I.C. § 6-1013. Nonetheless, Dr. Hofbauer's review of Suhadolnik's medical records in this case does not provide any information regarding the local standard of care.

Mr. Suhadolnik do not vary by locale and thus could be considered the same as national standards."

Dr. Hofbauer is a board-certified ophthalmologist currently practicing in Beverly Hills, California, with a multitude of experience in ophthalmology and cataract surgeries. Therefore, he is presumed to be knowledgeable of the class of specialists of which Dr. Pressman is a member. However, he must also demonstrate knowledge of the local standard of care in order for his testimony to be admissible.

Dr. Hofbauer stated in his affidavit that his knowledge of the local standards was derived from the following sources:

> I have actual knowledge of the standard of care as it existed in Boise, Idaho, during May of 2006 as it related to the provision of medical care to Franz Suhadolnik by Dr. Pressman. My knowledge comes from my experience and training, as well as from the testimony provided by Dr. Pressman in his deposition and of the medical records of Franz Suhadolnik.

While the district court acknowledged that an out-of-area expert can demonstrate knowledge of a local standard of care by reviewing deposition testimony, the court held that Dr. Pressman's deposition did not contain sufficient evidence of the local standard to render Dr. Hofbauer's affidavit admissible. Specifically, the court noted that: (1) Dr. Pressman testified that he was not aware of the standard of practice in 2006 for patients who were, or had been, on Flomax because the medical evidence was inconclusive at the time; and (2) Dr. Pressman never testified that the local standard was the same as the national standard. This determination is not an abuse of discretion because reliance on deposition testimony alone is already at the outer bounds of adequate foundational evidence, and because Dr. Pressman's testimony is too inconclusive to provide a sufficient basis of knowledge for Dr. Hofbauer's conclusions.

The facts of this case are similar to *Rhodehouse*, wherein an expert attempted to rely on deposition testimony without speaking to a local specialist, because Dr. Hofbauer did not rely on a conversation with a local practitioner in order to familiarize himself with the local standard of care. Although Idaho case law does not specifically require such a discussion, this fact alone distinguishes this case from *Kozlowski* (expert reviewed defendant's deposition, the depositions of several nurses and spoke to a local specialist)*, Perry* (expert reviewed the deposition testimony of three nurses and spoke to the executive director of the state nursing board, as well as several faculty members at Idaho schools), *Hayward* (expert spoke to local pharmacist,

reviewed depositions of defendant-pharmacists, and reviewed plaintiff's medical records), *Grover* (expert spoke to several local dentists, administered and observed state licensing exams and was familiar with national standards adopted in the state), and *Shane* (expert spoke to another out-of-area expert familiar with the standard of care), wherein all of the experts spoke to local specialists, or persons knowledgeable of the local standard, in order to familiarize themselves with the local standard of care. Dr. Hofbauer's efforts to ascertain the local standard of care are further distinguishable from the efforts of the experts in *Kozlowski*, *Perry*, and *Hayward*, because each of those experts, in addition to speaking to a local specialist, also reviewed *multiple* depositions of persons knowledgeable of the local standard, whereas Dr. Hofbauer reviewed only one and it was inconclusive.

Furthermore, this case is also similar to *Rhodehouse*, where the reviewed deposition failed to identify the local standard of care or the existence of a national standard, because Dr. Pressman's deposition gives no indication that the local standard had been replaced by a national standard and makes only vague references to a local standard of care.

Q [Mr. Pedersen]: When did you first become aware that Flomax could—the use of Flomax in a patient could increase the risks of a complication during cataract surgery?

A [Dr. Pressman]: Well, the first report[] in a peer review journal was in 2005. There were some non-peer reviewed articles in the throwaway journals that had talked about it. So in approximately 2005, there was some early indication that there was possible issues related.
…

Q: Before you retired and you were doing cataract surgeries, and you were aware that a patient was on—had taken Flomax, what did you tell a patient about Flomax, if anything?

A: Well, the data was not very conclusive in 2006. And I would have said something general, such as, there is a slightly increased risk of complications in people who are on Flomax.

Q: You would have said 'slightly'?

A: Uh-huh.

Q: Was it the standard of care to say 'slightly'?

Mr. Jones: Object to Form.

The Witness: *I'm not aware of what the standard practice in the community was for that particular drug at that particular time. Because as I said, the data on Flomax was fairly recent and was not conclusive at that time.*
…

Q [Mr. Jones]: Doctor, did the standard of practice in place in May of 2006 require you to disclose that the medication Flomax carried with it any increased risk at all of complications?

A: No.

Q: Why not?

A: Flomax was—the association with any issues with cataract surgery was very unclear at the time. It was just beginning to be noticed. And there was no clear definition of what those complications were, what the risks were. The risk rate of complications from Flomax in cataract surgery is very small, so—

Q: When you say "small," how small are you talking?

A: Well, the complication rate of cataract surgery is small. And the number of patients on Flomax is small. And complications that are of any visual significance are very small. So very, very slight.
…

Q [Mr. Pedersen]: Before, you told me that if you'd have known about Flomax, you would have told the patient about it. Are you changing your testimony on that? You would have told him that there was an increased risk?

A: *I would have said that there is a slight increased risk, yeah, typically.*

Q: Regardless of what you said when your counsel asked you a question, that's a fact, isn't it? I mean, you've already said that's true, isn't it?

Mr. Jones: Object to form.

The Witness: I typically would have said that there was a slight increased risk, yes.

(emphasis added). Review of this testimony indicates that Dr. Pressman had no personal knowledge of a local standard of care regarding precautions to take with patients who had used Flomax or as to what information to provide such patients regarding the increased risks resulting from prior use of Flomax. Furthermore, although Dr. Pressman states that he personally would

have warned about the risks of Flomax, the definition of a standard of a care is an objective standard. Even if Dr. Pressman personally would have warned Suhadolnik regarding the risks of Flomax, if he was not aware of this practice being a community standard, the testimony cannot serve as a foundation for identifying the local standard of care. *See* I.C. § 6-1012. Additionally, Dr. Pressman's deposition does not establish that the local standard has been replaced by a national standard because there is no mention anywhere in the deposition regarding a national standard. Consequently, Dr. Hofbauer's statement that the standard of care is equivalent to a national standard is without foundation and inadmissible. *McDaniel*, 144 Idaho at 223, 159 P.3d at 860 ("Conclusory statements that an expert is familiar with the local standard because he is familiar with the national standard are insufficient to meet the requirement of Idaho Code § 6-1013."). Therefore, Dr. Hofbauer's reliance on Dr. Pressman's deposition does not meet the foundational requirements of I.C. § 6-1013.

The Suhadolniks argue that the district court erred in narrowing the standard of care to Flomax in particular, rather than allowing the general standard testified to in Dr. Pressman's deposition regarding "adequate patient history" and "staying informed on medical journals" to be a sufficient basis for the local standard.

In his deposition, Dr. Pressman stated:

Q [Mr. Pedersen]: Well, for example, would you say it's a standard practice to use sterile technique when you do an operation?

A [Dr. Pressman]: I would.

Q: Standard of practice to keep current on the medical literature in the field that you're in?

A: Yes.

Q: Now, I want to make sure we go back to we're here to talk about an operation that was performed on May 30th, '06. You're aware of that?

A: Correct.
…

Q: Was it the standard of practice back in May of '03 in this community to take an adequate history before you did a cataract history?

A: In May of '03, yes.

Q: In May of '06?

A: Oh, in May of '06. Yes.
…

Q: And was it the standard of care to—I asked you before generally. But at this time, was it the standard of care to keep current in the medical literature in your field?

Mr. Jones: Object to form.

The Witness: Standard of practice is, in the community, is to keep current on recent medical journals, yes.

Q [Mr. Pedersen]: How did you go about doing that back in '06?

A: We subscribe to many medical journals. We make use of the library at Saint Al's primarily, although St. Luke's also. We attend continuing medical education courses. We talk to peers.

Q: Do you keep track of what the FDA says about drugs?

A: We are advised about those, yes.

Q: Was it standard of practice to pay attention to those?

A: Yes.

Dr. Hofbauer used these general admissions as a basis for his standards regarding adequate patient histories and reviewing medical journals in paragraph 6(a), (b), and (d) of his affidavit. However, the district court identified the local standard of care as "concerning precautions due to past use of the medication Flomax" specifically and did not address Dr. Hofbauer's reiteration of the more general standards of care.

The district court's narrowing of the standard of care to Flomax particularly is not an abuse of discretion because this Court generally identifies the standard of care in terms of the major facts appurtenant to the case. *See Perry*, 134 Idaho at 51, 995 P.2d at 821 (identifying the relevant standard of care as the administration of intramuscular injections); *Kozlowski*, 121 Idaho at 829, 828 P.2d at 858 (identifying the standard as requiring ob-gyns to "conduct a biophysical profile or use ultrasound to determine fetal size"); *Grimes*, 113 Idaho at 520, 746 P.2d at 979 (identifying the standard of care for use of amniocentesis to diagnose amnionitis). It was

- 14 -

therefore within the bounds of discretion for the district court to identify the local standard in terms of Flomax because it was the side effects and risks associated with this drug particularly that are alleged to have caused Suhadolnik's injuries.

Finally, the Suhadolniks argue that even if Dr. Pressman's deposition testimony is inadequate to establish a standard of care for taking a patient's medical history, this standard is a statewide standard that has replaced the local standard of care. They argue that, like in *Grover*, where statewide dental standards replaced any local standard for taking a patient's medical history, I.C. §§ 54-1811 through 54-1834 similarly require an adequate patient history regardless of what is customary in a particular locale. The Suhdolniks fail to cite any text from these statutory provisions and fail to provide any argument as to how these provisions have replaced the local standard for taking a patient's medical history. Rather, they cite to *Grover* as establishing a statewide mandate in every profession requiring an adequate patient history. However, the Court in *Grover* emphasized the power of the state licensing board of dentistry to implement statewide standards, specifically addressed the act adopted by the Legislature in implementing these standards, and identified the expert's familiarity with these standards because of his administration and observation of the state licensing exam, in order to support the determination that the local standard of care had been replaced by a statewide standard of care.[9] There is no similar discussion in the Suhdolniks' brief regarding the state medical licensing board adopting statewide standards, or the implementation of such standards in an act governing the entire field of ophthalmology. Additionally, Dr. Hofbauer never provided any foundation for his conclusion that adequate patient histories have been adopted as a statewide standard and there is no explanation as to what would constitute an "adequate" patient history. Therefore, the Suhadolniks have failed to demonstrate that Idaho has adopted a statewide standard in the field of ophthalmology for the administration of a patient's medical history.

The Court is cognizant of the fact that outside experts may encounter difficulty in locating a local practitioner who will cooperate in providing information regarding the standard of care prevailing in the community, particularly in smaller communities where practitioners live and work in rather close proximity with one another. On the other hand, the Court is also cognizant of the fact that increased communication and availability of medical information has

---

[9] The dentist in *Grover* took no patient history so it was obvious that he breached the standard of care. Further, *Grover* did not deal with the question of what might constitute an "adequate" history.

resulted in more standardization of practice between practitioners in urban centers and those in rural communities. As we noted in *McDaniel*, "Recent years have witnessed increasing standardization in the health care profession, due to a variety of factors." 144 Idaho at 224, 159 P.3d at 861. Those factors include governmental regulation, development of regional and national provider organizations, and greater access to the flow of medical information. We stated, "in the present medical care environment, there are a variety of ways that a medical malpractice plaintiff may be able to establish a local standard of care as being synonymous with a regional or national standard of care." *Id.* As shown above, there are various avenues by which a plaintiff may proceed to establish a standard of care, with or without the cooperation of local practitioners. The record in this case does not reflect what efforts, if any, Suhadolnik or his expert made to learn the standard of care from a local practitioner (other than from Dr. Pressman's deposition), but it isn't too much to ask of a plaintiff that some effort be made. Failing that, Suhadolnik's counsel could have made a more valiant effort to piece together a case from Dr. Pressman's deposition and affidavit but failed to do so.[10] As Respondents' counsel noted during oral argument of this case before the Court, it is not up to the Court to make a plaintiff-appellant's case for him.

Because the Suhadolniks have failed to establish Dr. Hofbauer's actual knowledge of the local standard of care pertaining to cataract surgery, the district court acted within its discretion in holding his testimony to be inadmissible. We therefore affirm that holding.

### C. The Suhadolniks waived their lack of informed consent argument.

The Respondents argue that the Suhadolniks waived any argument on appeal regarding their claim for lack of informed consent because it was not separately raised or briefed before this Court. The Suhadolniks only provide argument in their opening brief regarding the foundational requirements for a medical malpractice claim and fail to separately identify their informed consent claim as an issue on appeal.

---

[10] A fair reading of Dr. Pressman's deposition indicates that there were standards of practice for his professional specialty in the medical community and that he adhered to those standards. He stated twice that he would have advised a patient of an increased risk of complications if the patient was on Flomax. Since Dr. Paris' report was in his file and indicated that Suhadolnik was on Flomax, it can be inferred for summary judgment purposes that Dr. Pressman was aware of this information (even though the information was not correct). When asked at oral argument whether these facts would be indicative that a standard of care required Dr. Pressman to inform Suhadolnik of the increased risk, Suhadolnik's counsel responded in the negative, saying that Dr. Pressman's manner of practice could not establish the local standard of care. Whether or not these facts would be sufficient to establish the local standard of care, it might have been more helpful for counsel to have responded in the affirmative.

A medical malpractice claim is a cause of action separate and distinct from a claim for lack of informed consent. *Foster v. Traul*, 141 Idaho 890, 894-95, 120 P.3d 278, 282-83 (2005). The foundational requirements for expert testimony for an informed consent claim vary somewhat from those in I.C. §§ 6-1012 and 1013. According to I.C. § 39-4506:

> Consent, or refusal to consent, for the furnishing of hospital, medical, dental or surgical care, treatment or procedures shall be valid in all respects if the person giving or refusing the consent is sufficiently aware of pertinent facts respecting the need for, the nature of, and the significant risks ordinarily attendant upon, such a patient receiving such care, as to permit the giving or withholding of such consent to be a reasonably informed decision. Any such consent shall be deemed valid and so informed if the physician or dentist to whom it is given or by whom it is secured has made such disclosures and given such advice respecting pertinent facts and considerations as would ordinarily be made and given under the same or similar circumstances, by a like physician or dentist of good standing practicing in the same community. As used in this section, the term "in the same community" refers to that geographic area ordinarily served by the licensed general hospital at or nearest to which such consent is given.

In their opening briefs, the Suhdolniks make no mention of this or the other informed consent statutes, nor do they present argument as to how the district court may have erred in applying I.C. §§ 6-1012 and 1013 to the informed consent issue. Therefore, the issue is waived on appeal.

**D. Respondents are not entitled to attorney fees on appeal.**

Respondents argue that they are entitled to attorney fees on appeal pursuant to appellate rule 54(e)(1) and I.C. § 12-121. "Idaho Code § 12-121 permits an award of attorney fees in a civil action to the prevailing party if the court determines the case was brought, pursued or defended frivolously, unreasonably or without foundation." *Newberry*, 142 Idaho at 292-93, 127 P.3d at 195-96. Although Respondents prevail on appeal, the Suhadolniks' arguments are not unreasonable. As previously discussed, the case law suggests that review of deposition testimony alone can provide an appropriate foundation for expert knowledge of the local standard of care and the deposition relied on in this case identified several general standards used by Dr. Hofbauer. Although they are ultimately too general to identify the local standard of care, the Suhadolniks' arguments are reasonable and, therefore, an award for attorney fees is inappropriate in this case.

**III.**

**Conclusion**

The Court affirms the district court's exclusion of Dr. Hofbauer's affidavit for failure to meet the foundational requirements of I.C. § 6-1013. Consequently, the Court affirms the district court's grant of summary judgment in favor of the Respondents. Costs on appeal are awarded to Respondents.

Justices BURDICK, W. JONES and HORTON CONCUR.

Chief Justice EISMANN, specially concurring.

I concur in the majority opinion, but write only to add additional thoughts as to what is required to establish the local standard of care. "How an expert becomes familiar with that standard of care is a legal issue, not a medical issue." *Ramos v. Dixon*, 144 Idaho 32, 37, 156 P.3d 533, 538 (2007). Thus, the medical expert needs assistance from counsel in knowing what is required to learn the applicable standard of care.

The applicable standard of care must be specific to the issues of care involved in the particular case. "The standard of care is simply the care typically provided under similar circumstances by the relevant type of health care provider in the community at the time and place of the alleged negligent act." *Shane v. Blair*, 139 Idaho 126, 130, 75 P.3d 180, 184 (2003).

In this case, Dr. Pressman answered "yes" to the questions of whether it was the standard of practice "to take an adequate history before you did a cataract history," "to keep current in the medical literature in your field," and to "pay attention to [what the FDA says about drugs]." General questions such as this do not establish the applicable standard of care, any more than a question such as, "It is the local standard of care not to commit malpractice?"